# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA for the Use and Benefit of PENN AIR CONTROL INC., a California Corporation,<br><br>                       Plaintiff,<br>  v.<br>BILBRO CONSTRUCTION COMPANY, INC., a California corporation, and INTERNATIONAL FIDELITY INSURANCE COMPANY, a New Jersey corporation,<br><br>                       Defendants.<br>BILBRO CONSTRUCTION COMPANY, INC., a California corporation<br><br>                       Counterclaim Plaintiff,<br>  v.<br>PENN AIR CONTROL INC., a California Corporation, and ALPHA MECHANICAL, INC., a California corporation,<br><br>                       Counterclaim Defendants, | CASE NO. 16cv0003-WQH-NLS<br><br>ORDER |

| | |
|---|---|
| 1 | ALPHA MECHANICAL, INC., a California corporation |
| 2 | |
| 3 | Counterclaim Plaintiff, |
| | v. |
| 4 | BILBRO CONSTRUCTION COMPANY, INC., a California corporation; FERGUSON PAPE BALDWIN ARCHITECTS, INC., a California corporation; SHADPOUR CONSULTING ENGINEERS, INC., a California corporation; SPARLING, INC., a Washington corporation; and DOES 1 through 10, |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | Counterclaim Defendants, |
| 10 | |

HAYES, Judge:

The matter before the Court is the Motion to Dismiss Alpha Mechanical, Inc.'s ("Alpha's") First Amended Counterclaim filed by Sparling, Inc. ("Sparling"). (ECF No. 111).

**I. Procedural History**

On July 17, 2015, Penn Air Control, Inc. ("Penn Air") initiated this action by filing a complaint against Bilbro Construction Company, Inc. ("Bilbro") and International Fidelity Insurance Company ("Fidelity") alleging: (1) breach of contract; (2) quantum meruit; (3) imposition of statutory penalties; and (4) recovery under Miller Act Payment bond. (ECF No. 1). Penn Air seeks damages incurred from nonpayment for serviced performed during the renovation of the Watkins Hall, Building 245, Naval Support Activity Monterey, California ("the Project").

On October 19, 2015, Bilbro filed a counterclaim against Penn Air and Alpha. (ECF No. 17). On January 19, 2016, Alpha filed a counterclaim against Bilbro, Ferguson Pape Baldwin Architects ("FPBA"), Sparling, and Shadpour Consulting Engineers ("SC Engineers"). (ECF No. 45). Alpha's counterclaim included a cause of action for negligence against Sparling and FPBA. On February 12, 2016, FPBA filed a motion to dismiss Alpha's negligence counterclaim. (ECF No. 56). On February 12,

2016, Sparling filed a motion to dismiss Alpha's negligence counterclaim. (ECF No. 59).

On August 26, 2016, the Court issued an order denying the motion to dismiss the negligence counterclaim filed by FPBA and granting the motion to dismiss the negligence counterclaim filed by Sparling. (ECF No. 95). The Court found that "Alpha ha[d] not alleged sufficient facts to establish that Sparling owed Alpha a legal duty of care." *Id.* at 14. On September 6, 2016, Alpha filed the motion for leave to file an amended counterclaim. (ECF No. 97). On November 3, 2016, the Court issued an order granting Alpha's motion for leave to file an amended counterclaim. (ECF No. 107). On November 8, 2016, Alpha filed the First Amended Counterclaim ("FAC"). (ECF No. 108).

On November 23, 2016, Sparling filed the Motion to Dismiss Alpha's FAC. (ECF No. 111). On December 23, 2016, Alpha filed a response in opposition. (ECF No. 116). On December 30, 2016, Sparling filed a reply. (ECF No. 118).

**II. Allegations in Alpha's First Amended Counterclaim (ECF No. 108)**

Alpha alleges that "[o]n April 20, 2012, the Department of the Navy, Naval Facility Engineering Command Southwest (the "Navy") awarded Bilbro with the prime contract for the renovation of the Watkins Hall, Building 245, Naval Support Activity Monterey, California for the amount of $7,321,712.00 (the "Project")." (ECF No. 108 at ¶ 10). Alpha alleges that Bilbro was the "Prime Contractor" and "contracted with FPBA to provide architectural design services for the Project, designating FPBA as the Designer of Record for the Project." *Id.* at ¶ 12. "FPBA contracted with Sparling, whereby Sparling, as an acoustical consultant, agreed to provide '. . . noise prediction of the expected noise levels from the new HVAC equipment; Establish preliminary noise and vibration control measures . . . and Coordinate and refine noise and vibration control measures with the team . . .'" *Id.* at ¶ 13. Alpha alleges that "[o]n October 29, 2012, Bilbro entered into a written subcontract with Alpha designating Alpha as a subcontractor on the Project[.]" *Id.* at ¶ 14. Alpha alleges that to "assist[] Bilbro with

the Project, Alpha cosigned on a performance bond and payment bond[.]" *Id.* at ¶ 16.

"Under the design quality control plan Alpha was to submit its design-build plans to FPBA, the Designer of Record, and Bilbro, the Prime Contractor, for review and approvals. Subsequently, Bilbro would submit the final proposal to the Navy for approval." *Id.* at ¶ 17. "[O]n or about June 20, 2012, Alpha entered into a written agreement with SC Engineers, a consulting engineering firm, to design the mechanical system for the Project in accordance with the terms and conditions of their agreement[.]" *Id.* at ¶ 18. "The design-build submittal and review was divided into stages of 35%, 75% and 100% design completions. With every stage, Alpha would submit the proposed plans to Bilbro and would receive commentary, changes and revisions from Bilbro, FPBA and Sparling." *Id.* at ¶ 19.

"On or about October 30, 2012, Sparling conducted an onsite review of the plans and designs." *Id.* at ¶ 20. "On November 14, 2012, Sparling issued a memorandum which noted a potential issue with noise levels." *Id.* at ¶ 22. Alpha alleges that SC Engineers subsequently asked Sparling "for a comprehensive review and detailed recommendations[,]" and Sparling responded by "noting eight specific units which would require enclosures to meet the noise level requirements." *Id.* at ¶ 23-24. Alpha alleges that "[a]t this time . . . Sparling was and remained the only sound consultant and acoustical expert on the Project." *Id.* at ¶ 25.

"From October 30, 2012 to April 30, 2013, Sparling, FPBA and Bilbro discussed the concern of the stringent noise level requirements of the Project with Alpha and SC Engineers and proposed several recommendations to address the anticipated noise in these eight isolated rooms." *Id.* at ¶ 26. Alpha alleges that in April 2013, FPBA informed Sparling that Alpha requested that "Sparling review and verify the material prior to Alpha's implementation. Sparling reviewed and approved the sketch of the enclosures and the materials for Alpha to proceed." *Id.* "On April 3, 2013, Bilbro notified Alpha that it received the 100% design approval and was ready to proceed with construction." *Id.* at ¶ 27.

Alpha alleges that after it completed its work, "in or about June, 2014, the Navy noted that 23 of the rooms in the Watkins Hall exceeded Navy's noise level requirements. None of the 23 rooms were noted as a potential problem by Bilbro, FPBA and Sparling during their review, revision and subsequent approvals of Alpha's proposed designs and equipment." *Id.* at ¶ 31. Alpha alleges "the 8 rooms initially noted as a potential problem did not exceed the required noise level threshold and were not included in the list of the 23 rooms noted by the Navy." *Id.*

"To address the noise issues, Bilbro emailed 'all involved' including Sparling, FPBA, Penn Air, Alpha and SC Engineers . . . FPBA also apprised Sparling of the noise problem discovered after Alpha completed its installation." *Id.* at ¶ 32. "In July of 2014, Sparling provided Bilbro with a Professional Services Proposal and Agreement which proposed to '. . . visit Watkins Hall to assess the noise associated with the equipment . . . prepare a document presenting findings, recommendations and the next steps needed to resolve the noise issues . . .'" *Id.* at ¶ 33.

"In response, on or about September 2, 2014, Bilbro entered into a Design-Consultant Agreement with Sparling to '. . . [p]repare a document presenting findings, recommendations and the next steps needed to resolve the noise issues . . .' and to work with the team to meet the noise level criteria of the Project. This agreement specifically tasks Sparling with communicating with Bilbro's subcontractor, Alpha, to resolve the noise issues." *Id.* at ¶ 34. "By entering into this agreement with the general contractor, Sparling was agreeing to provide recommendations to reduce the noise levels, which Sparling knew that Alpha as the only mechanical contractor on the Project would be implementing. Sparling was also agreeing to now act as the acoustical expert directly for Bilbro, not FPBA." *Id.* at ¶ 35.

"On or about June 25, 2014, Sparling visited the Project and prepared a memorandum with findings and recommendations of what should be done by Alpha to decrease the noise. Alpha implemented Sparling's suggestions, but the noise levels in the 23 rooms did not decrease." *Id.* at ¶ 36. Alpha alleges that "Bilbo, FPBA and

Sparling continued to provide Alpha with various suggestions[,]" and as a result, "Alpha had to purchase new equipment, remove prior installations, install new materials, purchase additional supplies and to remobilize its crew at least on four separate occasions during the period of August 2014 through May 2015." *Id.* at ¶ 37.

Alpha alleges that on six occasions, "Sparling prepared separate memorandums recommending various alterations by Alpha to selected equipment and various sound attenuation methods." *Id.* at ¶ 38. Alpha alleges that "[o]n January 28, 2015, Sparling contacted Alpha directly and offered a new solution for" two specific rooms – and "Alpha implemented the recommendation and informed Sparling that it did not effectively reduce the noise level." *Id.* at ¶ 40. "On March 24, 2015, Sparling provided new mock ups directly to Alpha asking them to implement, which Alpha did." *Id.* at ¶ 41. Alpha alleges that "all of [Sparling's] opinions, recommendations and proposed solutions as an acoustical expert, were being communicated by Sparling directly with Alpha as Alpha was the only subcontractor who could implement Sparlings'[sic] recommendations." *Id.* at ¶ 42.

"The solutions presented by Bilbro, FPBA and Sparling did not effectively reduce the noise level in all the rooms and the Navy refused to accept the Project." *Id.* at ¶ 43. Alpha alleges that on May 22, 2015, Bilbro terminated the Subcontract "and withheld $323,352.00 still owing to Alpha." *Id.* at ¶ 45. Alpha alleges that it "remained a cosigner on the performance bond and payment bond for the Project" despite being "precluded from access to the Project and the ability to implement its proposed changes." *Id.* at ¶ 46-47.

Alpha alleges that it "was justified in relying on Sparling as an acoustical engineer and consultant to provide professional services for the Project and to provide Alpha with proper directions, guidance, instructions and recommendations during the Project and subsequently to address the noise issues." *Id.* at ¶ 63. Alpha alleges that Sparling breached its duty to Alpha by "failing to meet the applicable standard of care due in performing their professional services[.]" *Id.* at ¶ 64. Alpha alleges that "[a]s

a direct and proximate result of . . . Sparling's negligence, Alpha has suffered damages" including the cost of purchasing new equipment, installing new materials, and purchasing additional supplies, "in an amount estimated at approximately $1,121,564.57[.]" *Id.* at ¶ 65.

## III. Legal Standards

### A. Standard of Review

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal for "failure to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). Federal Rule of Civil Procedure 8(a)(2) provides that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). "A district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is proper if there is a 'lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.1988)).

"[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual

content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

### B. Negligence

Under California law, to establish a claim for negligence a plaintiff must plead (1) duty; (2) breach; (3) causation; and (4) damages. *Ileto v. Glock Inc.*, 349 F.3d 1191, 1203 (9th Cir. 2003). "The threshold element of a cause of action for negligence is the existence of a duty to use due care toward an interest of another that enjoys legal protection against unintentional invasion." *Bily v. Arthur Young & Co.*, 834 P.2d 745, 760 (Cal. 1992). "Courts sometimes impose a duty to prevent pure economic loss when there is no privity of contract when the injured party is an intended beneficiary of a contract between the defendant and another party." *The Ratcliff Architects v. Vanir. Constr. Mgmt., Inc.*, 106 Cal. Rptr.2d 1, 8 (Cal. Ct. App. 2001).

The Supreme Court of California has held that "[w]here a special relationship exists between the parties, a plaintiff may recover for loss of expected economic advantage through the negligent performance of a contract although the parties were not in contractual privity." *J'Aire Corp. v. Gregory*, 598 P.2d 60, 63 (Cal. 1979). To assess whether there is a "special relationship" in the absence of privity of contract, California courts balance six factors: (1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct, and (6) the policy of preventing future harm. *Biakanja v. Irving*, 320 P.2d 16, 19 (Cal. 1958).

### IV. Discussion

Sparling contends that Alpha has failed to cure the pleading deficiencies in its original counterclaim that was previously dismissed by this Court. Sparling contends that the newly-alleged agreement between Bilbro and Sparling "do[es] not change the

nature of Sparling's relationship with Alpha and the contractual chain of command for the Project[.]" (ECF No. 111-1 at 20). Sparling contends that it had no control over whether Alpha adopted or otherwise used Sparling's acoustical recommendations. *Id.* at 21. Sparling contends that "[u]ltimately, whether Sparling performed its work for FPBA or Bilbro, does not change the fact that Sparling was not in privity with Alpha[.]" (ECF No. 118 at 4).

Alpha contends that "the main basis of [its] FAC against Sparling" is the new factual allegation that "Sparling was engaged for the second time directly by Bilbro to assess the noise problem and tell Alpha how to fix it." (ECF No. 116 at 14 n.2). Alpha contends that the FAC contains allegations of an agreement between Bilbro and Sparling that was not previously plead in Alpha's original counterclaim. Alpha contends that the Design-Consultant Agreement was made between Bilbro and Sparling following the Navy's finding that twenty-three of the rooms in the Project failed to meet the Navy's sound requirements. Alpha contends that Sparling entered into this agreement with Bilbro to "provide recommendations to reduce the noise levels, which Sparling knew Alpha, as the only mechanical contractor on the Project, would implement." *Id.* at 9. Alpha contends that it performed work on four separate occasions to reduce sound levels pursuant to Sparling's recommendations. Alpha contends that Sparling directly communicated "recommendations and solutions to Alpha so Alpha could implement and bring the Project into acoustical compliance." *Id.* at 10.

Alpha has not alleged that there is contractual privity between Alpha and Sparling, or that a statute establishes the duty of care between the two parties. To demonstrate a duty of care, Alpha must allege facts to satisfy the "checklist of factors" set forth in *Biakanja* that courts use "to consider in assessing legal duty in the absence of privity of contract between a plaintiff and a defendant." *Bily*, 834 P.2d at 761; *see also Beacon Residential Cmty. Assn. v. Skidmore, Owings & Merrill LLP*, 327 P.3d 850, 853 (Cal. 2014) ("This case is concerned solely with the first element of negligence, the duty of care.").

1  Under the first *Biakanja* factor, the extent to which the transaction was intended
2  to affect Alpha, Alpha alleges that in September 2014, Bilbro and Sparling entered into
3  a contract to provide recommendations to Alpha regarding compliance with the Navy's
4  sound criteria. Alpha includes an excerpt from the agreement in its FAC. *Id.* at ¶ 34.
5  Alpha alleges the agreement states that Sparling was to ". . . [p]repare a document
6  presenting findings, recommendations and the next steps needed to resolve the noise
7  issues. . ." *Id.* Alpha alleges the agreement "specifically task[ed] Sparling with
8  communicating with Bilbro's subcontractor, Alpha, to resolve the noise issues." *Id.*

9  Sparling was "the only sound consultant and acoustical expert on the Project."
10 *Id.* at ¶ 25. As a result of the September 2014 contract, Sparling was working directly
11 with Bilbro to provide recommendations to Alpha regarding the noise level. The
12 agreement between Bilbro and Sparling supports the inference that Sparling's noise
13 level recommendations were intended to be acted upon by Alpha. Sparling's agreement
14 with the primary contractor, Bilbro, eliminated the separation between Sparling and
15 Alpha, and plausibly supports the inference that Alpha was the intended beneficiary of
16 Sparling's recommendations and advice. *See Apex Direct. Drilling, LLC v. SHN*
17 *Consulting Eng'rs & Geologists, Inc.*, 119 F. Supp.3d 1117, 1124-26 (N.D. Cal. 2015)
18 (finding a special relationship between lead engineer and subcontractor on a
19 construction project). This factor weighs in favor of imposing a duty of care.

20 The second *Biakanja* factor, foreseeability of harm, is present. While courts give
21 "limited weight to the foreseeability factor[,]" Alpha has alleged facts to support the
22 conclusion that it was foreseeable Alpha would suffer harm based on any negligent
23 recommendations offered by Sparling, pursuant to its agreement with Bilbro. Alpha has
24 alleged that Sparling was the principal and sole sound consultant and acoustical expert
25 on the project. (ECF No. 108 at ¶ 25). In *Beacon*, the Supreme Court of California
26 found it relevant to a *Biakanja* analysis that the defendants were "the principal
27 architects on the Project" and that "[a]mong all the entities involved in the Project,
28 defendants uniquely possessed architectural expertise." 327 P.3d at 860. The court

found that the defendants had not alleged that "anyone else had special competence or exercised professional judgment on architectural issues[.]" *Id.*

In this case, Alpha has alleged that Sparling agreed "to provide recommendations to reduce the noise levels, which Sparling knew that Alpha as the only mechanical contractor on the Project would be implementing." (ECF No. 108 at ¶ 35). Sparling allegedly prepared a memorandum addressed to Alpha concerning "various alterations . . . to selected equipment and various sound attenuation methods." *Id.* at ¶ 38. The Court concludes that Alpha has plead facts sufficient to show it was foreseeable that any negligence in the proposals and recommendations made by Sparling would adversely affect Alpha, which was engaged by Bilbro in a written subcontract relationship on the Project. *See id.* at ¶ 14. This factor weighs in favor of imposing a duty of care.

The third and fourth *Biakanja* factors, certainty of injury and the closeness of the connection between Sparling's conduct and the injury suffered, weigh in favor of imposing a duty of care. Alpha alleges that it adopted one of Sparling's recommendations in January 2015, and the recommendation failed to effectively reduce the noise level in two rooms. *Id.* at ¶ 40. Alpha alleges that after it "implemented" Sparling's recommendation, Alpha "informed Sparling" that the recommendation had failed. *Id.* Alpha alleges that Sparling was aware that its recommendations had failed to adequately reduce noise levels when the Navy identified the twenty-three problem rooms in June 2014. *Id.* at ¶ 31-32. Alpha alleges that Sparling proposed to "prepare a document presenting" Bilbro with "the next steps needed to resolve the noise issues" identified by the Navy in June 2014. *Id.* at ¶ 33. Alpha alleges that as a result of Sparling's negligence, Alpha has suffered approximately $1,121,564.57 in damages. *Id.* at ¶ 65.

These factual allegations are sufficient to support the conclusion that Sparling had knowledge that its actions could cause Alpha injury. *See Apex*, 119 F. Supp.3d at 1124 (finding the third and fourth *Biakanja* factors established with a showing that the subcontractor "had positive knowledge . . . that its actions were directly responsible for

considerable losses"). This factor weighs in favor of imposing a duty of care.

The fifth *Biakanja* factor, moral blame, has no application in this case because the relationships at issue involved arm's length transactions and Alpha has not alleged any facts to support a claim that Sparling acted in bad faith. *See* ECF No. 95 at 13.

The final *Biakanja* factor represents "the policy of preventing future harm." *Ratcliff*, 106 Cal. Rptr.2d at 8 (citation omitted). The Supreme Court of California has held that "[a]s a matter of economic and social policy, third parties should be encouraged to rely on their own prudence, diligence, and contracting power, as well as other informational tools." *Bily*, 834 P.2d at 765. Alpha is a sophisticated actor and had a responsibility to protect itself throughout its dealings on the Project with Bilbro, FBPA, and Sparling. *See* ECF No. 95 at 13. Alpha has alleged that it implemented Sparling's recommendations and purchased equipment and installed new materials to fully adopt Sparling's suggestions. (ECF No. 108 at ¶¶ 37-42). However, Alpha has not presented factual allegations to support an inference that Alpha was required to rely on Sparling's "recommendations" and "suggestions." *Id.* at ¶¶ 34, 37. This factor weighs against imposing a duty of care.

After a review of the *Biakanja* factors, the Court concludes that Alpha has alleged facts sufficient to plausibly support the conclusion that there was a special relationship between Alpha and Sparling, such that Alpha was an intended beneficiary of the contract between Bilbro and Sparling. *See Ratcliff*, 106 Cal. Rptr.2d at 8 ("Courts sometimes impose a duty to prevent pure economic loss when there is no privity of contract when the injured party is an intended beneficiary of a contract between the defendant and another party."). Alpha has alleged sufficient facts to infer that Sparling owed Alpha a legal duty of care. *See Apex*, 119 F. Supp.3d at 1125 ("California courts have repeatedly found construction design professionals potentially liable to third part[ies] . . . with whom they had no direct relationship.").

**V. Conclusion**

　　IT IS HEREBY ORDERED that Sparling's Motion to Dismiss Alpha's First Amended Counterclaim (ECF No. 111) is denied.

DATED: February 24, 2017

**WILLIAM Q. HAYES**
United States District Judge